Good morning, counsel. We're ready to hear argument in the case of Natural Resources Defense v. McCarthy. Thank you, Your Honor. May it please the court, Joe Bushyhead on behalf of the appellants. The district court dismissed this case with prejudice on a rule 12B6 motion on the narrow grounds that a decision to lift an off-road vehicle closure under 43 CFR section 8341.2a is in every circumstance, mandatory, ministerial, and thus exempt from NEPA, the National Environmental Policy Act, as a matter of law. I will focus my argument this morning on why the district court's reading of the regulation was an error, but I want to start with the 12B6 posture and for two reasons. First, this court is not judging the reasonableness of BLM's decision under the arbitrary and capricious standard of review. This appeal presents a legal question of regulatory interpretation. And so the standard of review is de novo. Neither the district court nor the United States are entitled to deference for their interpretation of 8341.2 as exempting compliance from NEPA. The second procedural item I want to raise here is that the United States arguments on appeal in part three of its response brief, these are arguments that address the 2008 Richfield Resource Management Plan, or RMP, should be rejected out of hand. I do intend to address these arguments on the merits, but at bottom, they rely on facts, not on law, and they must be judged after production of the administrative record here. So with that, I want to turn to the heart of this case, which is the plain language of the regulation. And I'll start with the provision's mandatory language. Section 8341.2a uses mandatory language, the word shall, only twice. And in both instances, the word speaks to closure. In the first instance, the word speaks to the implementation of a closure. Quote, the authorized officer shall immediately close the areas affected. And in the second instance, it speaks to the maintenance of a closure. These lands shall not be opened. The reopener provision, on the other hand, states that BLM must maintain a closure, quote, until the adverse effects are eliminated and measures implemented to prevent recurrence. And this provision preserves BLM's discretion for two reasons. First, there's no mandatory language. We see the district court placing emphasis on the word until, but the word until is not itself mandatory. It's a conjunction, a type of function word. So it's meaning depends on the words that follow. Well, isn't, isn't it though a trigger? Can it be read as a trigger? You do this until X, and then when X happens, then it changes. It can be read as an automatic trigger when the word is followed by something like a date certain or a specific timeframe, then until, right, the, were the regulation constructed that way, the closure would lift automatically. But here, until points to the discretionary actions BLM must take before it can lift a closure, which is really the second reason why BLM has discretion here. By its plain language, BLM cannot lift a closure until it takes action. The agency must eliminate adverse effects from OHVs. The agency must implement measures to prevent recurrence of those effects. These measures are left open-ended, discretionary, and they are part and parcel of BLM's decision to lift a closure. They are provided for in the text of the regulation. The district court really made two errors in reading this re-opener provision. The first was to presume for purposes of regulatory construction that BLM had already completed the discretionary measures. Let me back you up for a minute because I was, I needed to get to some language here to ask you about. So when you were, when you were telling us about what, what had to happen, and you were saying that BLM had to cause the adverse effects to be remedied and things like that, it doesn't say that, it says that BLM has to close it when a certain determination is made, and it says when that, when the adverse effects are eliminated and measures implemented to prevent recurrence, that it ends, but it doesn't, it doesn't specifically place every burden on BLM, at least textually, does it? I mean, you might be able to read it that way, but it's. I think this is really only an issue that comes up because the regulation, the re-opener provision is written in passive voice. It sort of invites that question of who is to take action here, but BLM as the management agency has the authority, has the control, regardless of whether BLM is in fact, the agency taking measures. The agency has control when it comes to remediating the effects from off-road vehicles. So I think it's. Is it, is it your position that BLM would have to, in order to make the determination that it can be opened back up, they'd have to do a full EIS? No, your honor. That's an open question. That's, that's, that's a factual question that, at essence, that we would judge on production of the administrative record on remand, the agency would have to. Your position for our purposes is just that the authorized officer doesn't get to just make this determination, that it opens back up. That's right. There's more than sort of this passive, evaluative action here. The BLM is itself either taking action itself, which I think is the situation that would actually occur on the ground, or at least has control over what the lifting of the closure looks like, the measures taken. And that's, so let me, let me back you up even further. So in order to close the area, all that's required there though, under your reading, is the authorized officer to say, hey, we need to close this. And so the authorized officer can then close it, but the authorized officer then doesn't have the, have the authority himself to just open it back up. To make the determination that the statutory or the regulatory condition has been satisfied. Right. And I think that really comes from a reading of this court's case in Carpenter, where that case involved the front end question of when, when and how BLM would implement a closure. That's not an issue here. And I'll note too, that the Carpenter case left the question of whether NEPA applies on the, to the implementation of a closure. It left that question unresolved. We're really focused here on the lifting of a closure, really in isolation. Well, is it, is that fair though, to say it's an isolation? I mean, you have the resource management plan, that's the backdrop. It seems to me of this case and to achieve that, as we all painfully know, there has to be a lot of procedures, particularly environmental studies that go on to say what will or will not happen in this particular area. And at that point, when the plan was promulgated, it was determined that this area would be open. So don't we rely and fall back to that? That's basically the bedrock that we start from in this case. Well, Your Honor, I come back to the 12B6 posture here and the fact that we don't yet have an administrative record. This case was decided on this pure question of law, on regulatory interpretation, and that's really the touchstone, but to take... Again, to answer my question, don't we have as a backdrop in this case, the resource management plan? And that, and that told us the area has been studied environmentally and it has been determined that it is fine to open this, these roads up. So that's where you start. It's okay to have open roads here. Well, Your Honor, I don't think that's a fair reading of the RMP. And I think there's a legal problem with that as well. As a factual matter, the Richfield RMP designated lands is open. Yes, but it kept the closure in place, quote, regardless of the OHP designations. It required a separate decision to lift the closure after BLM completed the discretionary measures necessary to lift the closure, to protect the right fish of cactus here, and it made the areas open designation subject to amendment. These are pages 82 and 87 of the appendix. The last point really gets to the legal problem that we face here. And that's that even after issuing an RMP, BLM retains discretion by law to amend the open designation to either limited or closed. That's provided for in both the broad land use planning regulations, the part 1610 regulations, and also expressly for OHV designation in 43 CFR 8342.3, that expressly reserves BLM's authority to amend, revise, or revoke land use plans. That question of here, it's not a question of whether BLM actually did revise the land use plan or amend the designation. It's that BLM had the choice. BLM had the option. It had this discretionary path it could take. Let me get at this a different way. It's a follow-up to what Judge Briscoe was pursuing, I think. What sort of EIS are you seeking here? Well, what do you conceive of as the EIS and why wouldn't that just be duplicating what was done for the RMP? Certainly, Your Honor, there is no, I'll return to the point to start, that there is no requirement. We don't know yet whether BLM needs to prepare a full EIS. Don't tell me you're not asking for that. That's what you're seeking. But what do you conceive of that? What would it do that's not duplicative? Of what had already been done under the rule of reason. The short answer is that there is no way the 2008 RMP EIS would have been able to evaluate the efficacy or the effects of off-road vehicle use with measures BLM put in place in 2019. There's a temporal gap. But I like challenging that and just, and you can challenge the opening order under the Administrative Procedure Act. That's not a NEPA claim. You're just saying that there needs to be review of this decision to open the road. And that's fine. And I think you could do that under the APA. Maybe I'm missing something. I'm asking what the environmental impact study would say that goes, essentially goes beyond that. That wouldn't be duplicative. When the RMP said open roads are okay here after an environmental impact study. I'm having a hard time seeing what you want. That's not a repetition. Well, to the extent we're viewing this through the rule of reason, that inquiry needs to happen. What would we be looking at? That inquiry needs to happen after production of the record. Fundamentally, the argument that BLM, that the United States is making here, that the 2008 Resource Management Plan already looked at the effects of lifting a closure, which is specious because we don't yet know, we did not know, the BLM did not know in 2008, what measures would be in place, what the actual effects of lifting the closure would be with the parameters of the closure order in place. The question of the rule of reason is really one that we need to look at. This argument of the sufficiency of the EIS is one that needs to be looked at on remand after production of the full administrative record. Can I make any suggestion of what this is all about? Oh, certainly. It's about the efficacy of the measures. The efficacy of the measures does not require an EIS. That just requires a review on the administrative record under your usual APA procedures. Right. And I'd return to the 12B6 posture here. We don't yet have the administrative record. And I'll note, too, that the way in the District of Utah, these cases proceed under Rule 7-4 for Olin House-style cases, the record is produced and there is a, we would have the chance to, at the very least, amend our complaint on review of the record to challenge the merits of the decision. We, this case was dismissed on this issue, on the NEPA claims alone, without the chance to amend. This was really the first crack. Do you see a distinction between the agency's exercise of discretion and the authorized person's exercise of judgment in determining whether the measures have been effective and the roads can reopen? And I'm thinking of the Sixth Circuit case. I think, I think you cited it in your brief. I mean, how do you distinguish between the two? Right. Well, certainly, Ron, and this really goes to this timing problem. The, with the reading, with the question of when to judge discretion, I think, first and foremost. A central question for this case is when do we judge discretion for the purpose of NEPA, and it applies to proposed federal action. So, we're looking at discretion before the point when. They're not proposing anything, are they? They just do it. Well, there's a regulation, there's a NEPA regulation on point here, 40 CFR 1508.23, that sets black letter law on this question of when the agency must evaluate discretion. I see I'm out of time. If I, if I may finish my answer. Please answer the question. The, so proposal, and I'll go to the definition here, that stage of the development of an action when an agency has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal, which means that discretion must be judged at the point when BLM has the goal of lifting the closure before it settles on and completes the discretionary component of this decision-making process. The district court here, and I think the question, your Honor's question, really hinges on a problem with the district court's reading that the question here, the district court judged discretion not at the proposal stage, like it must under NEPA, but at the very final implementation stage. And I hope that answers your question. Thank you. Thank you. We're ready to hear from the appellee. Yes. Thank you. Thank you. Andrew Birney for federal appellees, may it please the court. I'd like to start actually on an area where I think Mr. Bushyhead and I agree actually, and Judge Hartz, I think this goes to your question as well, and that's that the merits here are not before the court. Plaintiffs have not only challenged, not only not challenged the 2008 RMP's designation of this area as open to OHV use, they also haven't challenged the substance of the merits of the 2019 closure lifting action. And they could have done that, and frankly, perhaps they still can. What would happen then is the question would be whether the decision by the agency to lift the closure was contrary to the regulation, wasn't supported by substantial evidence, the APA standard, as you know, Judge Hartz, and so the question for the court in this case is not the merits of the decision. It's whether BLM, having determined, which we think is taken correct for purposes of this appeal because they don't challenge the substance of it, having determined that the adverse effects had been eliminated and measures put in place to prevent recurrence, whether lifting of the temporary closure at that point was mandatory. And the language of the regulation we think is clear that it is, and Judge Briscoe, you mentioned that doesn't until function as a trigger, and we think that's exactly what until means, both in this regulation and in ordinary speech. Mr. Bushy had referred to a limitation on that to a point in time that's certain, but I don't think that's how until works. If I say, for example, that I'm going to stay at a job until I finish, until I finish a brief, everyone would understand that as meaning I'm going to leave the job when the brief is completed, even if I don't know exactly when it is. And so the language of the regulation is clear. And that language is also conforms, also conforms the regulation to, to, to the stat, to the FLIPMA and to the Supreme Court's decision in Norton v. Sua. And we do think the, the, the RMP's designation of this area is, is important. BLM considered this issue at 2008. It, it, it performed environmental analysis. And don't you, don't you have the problem of the lapse of time? I mean, that's a long time ago, particularly when you're talking about fragile areas such as this and also plants and animals in this area. Well, there, there, there, there is a, there is a lapse, there is a lapse in time, your honor. And of course there is an option. You know, plaintiffs could petition for amendment of the RMP on account of changed circumstances. But until, until an amendment but as the Supreme Court made clear in the, in the Norton v. Sua case, until an RMP actually is amended, BLM is obligated to comply with it. And it's just any decisions that it makes that are inconsistent with it can be set aside as contrary to law. Plaintiffs' theory of this regulation is really a one-way ratchet, you know, really inverts, inverts that burden. And, and the other thing I would say, Judge Briscoe is, is is again, we don't dispute plaintiff's ability necessarily to challenge this interpretation under the APA, excuse me, not this interpretation, this temporary closure order as contrary to the regulation, they just haven't brought that challenge here. And the one thing I, the one thing I also want to add Judge Carson, I think you were asking about the standard for imposing a closure order. I think it's important to note that just as, that although the decision to lift a closure order requires a measure of judgment on the part of the agency, we, we cite cases for the proposition that judgment under statutory or regulatory criteria doesn't equal discretion for NEPA purposes, but so too does a decision to impose a closure order. I mean, BLM had to determine in 2006 that, that there were adverse effects being caused by the, by these OHVs. It had to identify the area where it was causing these adverse effects, the types of vehicles and impose the closure. I mean, it was the same level of judgment that there was no public comment before it imposed the, before it, before it imposed the closure order. The agency didn't perform NEPA review. We think that was perfectly proper and plaintiffs agree with us for that matter. But what they're asking this court to accept and what the district court properly rejected is this idea that the regulation functions that is that the regulation functions as a, as a one-way ratchet. They say that explicitly on page three. If you're looking at harms to environment, I can see their point of view. I mean, closure of the road would always be a positive for the environment, whereas opening the road would likely not be. Right. Your honor. Well, I guess I say a couple of things about that. First of all, I mean, we think that the way the regulation is drafted, yeah, that the, the agency's decision to lift a closure is just as not as non-discretionary once it makes the determination, just like imposing one. But again, I, I don't mean to repeat myself, but they, they can, they can, they can challenge that. Mr. Bush had criticized the district under the regulation by being an ordinary APA challenge. I mean, Mr. Bushy had criticizes the district court for dismissing this case on the pleadings rather than requiring the production of an administrative record. But I mean, if you look at the complaint in this case, it only mentions the regulation once in the legal background section, the complaint is very clear that this is purely a procedural challenge to claiming that NEPA review was required. And that's, that's a legal claim that we think is just wrong under this regulation under flip buy. Had they brought a substantive challenge claiming that this was arbitrary and capricious because, because the agency made an incorrect determination under the regulation, we assume that the administrative record would be, have been produced in the case would have been, would have been litigated that way. And again, perhaps they can still bring that claim, but that's not the claim they chose to bring. I'm happy to address any questions the court might have on any particular issue. I was just curious how, what is the longevity of an RMP? Do they just go on forever or? I mean, no, not necessarily your honor. I mean, there is, there, there is a process. There is, there, there, there, there, there is a process for, there is a process for a, there is a process for amendments. But until the RMP is amended, the, the, the agency has to comply with it. Mr. Bushy had referred to the RMP. I think we say this in our brief and I think this is important. If you look at I think page 82 of the appendix has the relevance has the relative relevant language, although it's, it's reproduced elsewhere. It, it, it keeps the temporary closure in place, but it makes clear that the, that the temporary closure will be in place only until the regulatory criteria are satisfied, so I don't think the RMP really the, the RMP only underscores what the text of the regulation in FLTMA itself make clear, which is that the temporary closure, which is intended to be temporary is to be lifted once BLM makes the determination that the regulation requires. If, if, if there are no further questions, we would ask the district court's judgment being affirmed. Thank you. Any rebuttal? Yes, Your Honor. If I may have the time. Sure. How about, how about a minute to wrap up? Sure. I haven't realized you'd gone over. Oh, absolutely. And I, I appreciate that. I really want to come back to this point of timing, this question of the determination to lift a closure being separate from the measure of the measures that BLM puts in place when it actually lifts a closure. The discretionary component here, the measures that BLM actually puts in place are part and parcel of the decision to lift a closure. They can't be segmented out in the way that the district court reads the regulation, the way that Mr. Bernie argues now. I also want to just quickly address the, the point. This is a factual matter here. We're not talking about one specific road. We're talking about 5,000 acres of, of essentially desert badlands that on which OHVs, off-road vehicles, can travel cross country. The, their off-road vehicles are currently allowed on designated roads in this area. And with that, I thank the court for its time and ask the court to reverse the demand. Thank you. Thank you. For your arguments this morning, case is submitted.